UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SETH D.,<br><br>                              Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  22-cv-02051-LL-JLB<br><br>**REPORT AND<br>RECOMMENDATION RE:<br>PLAINTIFF'S MERITS BRIEF**<br><br>**(ECF No. 16)** |

This Report and Recommendation is submitted to the Honorable Linda Lopez, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and General Order No. 707 of the United States District Court for the Southern District of California.

On December 27, 2022, plaintiff Seth D. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  Plaintiff filed an Amended Complaint on January 3, 2023, seeking judicial review of a decision by the Commissioner of Social Security (the "Commissioner") denying his applications for child's insurance benefits and for supplemental security income ("SSI").  (ECF No. 5.)

Now pending before the Court and ready for decision is Plaintiff's merits brief. (ECF No. 16.)  The Commissioner filed an opposition (ECF No. 18), and Plaintiff filed a reply (ECF No. 19).  For the reasons set forth herein, the Court **RECOMMENDS** that

Plaintiff's merit's brief be **GRANTED,** and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   PROCEDURAL BACKGROUND

On or about October 22, 2020, Plaintiff filed an application for child's insurance benefits under Title II of the Social Security Act and an application for SSI under Title XVI of the Social Security Act, alleging disability since March 10, 2012.  (Certified Administrative Record ["AR"] 20–21, 254–55.)   After his applications were denied initially and upon reconsideration (AR 163–68, 169–74, 177–82), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ") (AR 183–84).   An administrative hearing was held on September 13, 2021.  (AR 42–57.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from him and a vocational expert ("VE").  (AR 42–57.)

As reflected in his September 24, 2021, hearing decision, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from his alleged onset date through the date of the decision.  (AR 17–41.)[1]  After an extension, the ALJ's decision became the final decision of the Commissioner on November 28, 2022.  (AR 1–3.)  This timely civil action followed.

## II.   SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.  At Step One, the ALJ found that

---

[1]   With respect to Plaintiff's application for child's insurance benefits, the ALJ specifically found that Plaintiff was not disabled prior to March 19, 2015, the day before he turned twenty-two years old.  (AR 36.)  A claimant may be eligible for child's disability insurance benefits if he was "under a disability . . . which began before he attained the age of 22," 42 U.S.C. § 402(d)(1)(B)(ii), and was disabled "*continuously and without interruption* beginning before [his] twenty-second birthday until the time [he] applied for child's disability insurance benefits," *Smolen v. Chater*, 80 F.3d 1273, 1279–80 (9th Cir. 1996) (emphasis in original).

Plaintiff had not engaged in substantial gainful activity since March 10, 2012, his alleged onset date.  (AR 23.).

At Step Two, the ALJ found that Plaintiff had the following severe impairments: schizoaffective disorder, bipolar type; attention deficit hyperactivity disorder (ADHD); depressive disorder; anxiety disorder, unspecified type; and polysubstance abuse.  (AR 23.)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments.  (AR 23.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> he can understand, remember, and carry out simple job tasks and simple job instructions; he can interact appropriately with coworkers and supervisors, but the interaction must be noncollaborative and have no team work; he can have no public contact; he can respond appropriately to routine work situations, settings, and supervision; he can respond appropriately to changes in a routine work setting and situation; and, he can appropriately ask questions and use judgement [sic].

(AR 25.)

For purposes of his Step Four determination, the ALJ found that Plaintiff was unable to perform his past relevant work as actually or generally performed.  (AR 34–35.)

The ALJ then proceeded to Step Five of the sequential evaluation process.  As of the alleged onset date, the ALJ classified Plaintiff as a younger individual with a high school education for whom transferability of skills was immaterial.  (AR 35.)  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile could perform the requirements of occupations that existed in significant numbers in the national economy (*i.e.*, night cleaner, hand packager, cleaner), the ALJ found that Plaintiff was not disabled. (AR 35–36.)

///

## III.   DISPUTED ISSUES

As reflected in Plaintiff's merits brief, the disputed issues that Plaintiff is raising as the grounds for reversal and remand are as follows:

(1)   The ALJ failed to provide specific, clear, and convincing reasons supported by substantial evidence for discounting Plaintiff's subjective symptom testimony regarding his mental impairments (ECF No. 16 at 6–18); and

(2)   The ALJ improperly rejected the opinion of consultative psychiatric examiner, Gregory Nicholson, M.D., regarding Plaintiff's mental limitations (*id.* at 18–23).

## IV.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).

## V.   DISCUSSION

### A.   Background of Plaintiff's Mental Impairments

#### 1.   <u>Medical Record</u>

On January 5, 2014, Plaintiff, then a 20-year-old student at Penn State University, was involuntarily admitted to a hospital in Pennsylvania after police were called because Plaintiff was "out of control, smashing things, talking out of his head, [and] talking to a

refrigerator and the clock." (AR 382, 406.)  The psychiatric team that initially responded noted that Plaintiff was responding to questions "in a manner that did not make sense," and he "pulled out his hair by the root on two different occasions." (AR 406.)  The hospital assessed him as endorsing self-injurious behaviors, paranoid delusions, and impulsivity. (AR 409.)  His attention and concentration, as well as his insight and judgment, were deemed impaired. (AR 409.)  He was prescribed Risperdal. (AR 384.)

On April 20, 2014, Plaintiff voluntarily went to the hospital. (AR 368, 382.)  He presented as "very psychotic and agitated," "aggressively postured at staff," "refused any medications" and treatment, and tried to leave. (AR 382.)  He was given Haldol, Ativan, and Cogentin, which made him fall asleep. (AR 383.)  When he woke up, Plaintiff stated that he had stopped taking the Risperdal because he "didn't like how [he] felt" on the medication because it "slowed [his] thinking" and made him feel groggy. (AR 383.)  Plaintiff was prescribed Lithium. (AR 385.)  His mother reported that he had also previously been prescribed Adderall for a past diagnosis of ADHD and had been prescribed Ativan for an unclear reason the prior December. (AR 382.)

On July 20, 2014, Plaintiff again voluntarily went to the hospital and was "admitted for concern for psychosis." (AR 353, 356.)  His mental status examinations indicated he appeared psychotic, was responding to internal stimuli, and was endorsing paranoid delusions and auditory hallucinations. (AR 356, 358.)  He was also laughing inappropriately, and he had a flat and slightly incongruent affect, sparce and latent speech, and limited insight and judgment. (AR 356, 358.)  He was assessed as having very slow responses, appearing paranoid and guarded, and having intense eye contact. (AR 354.)  He reported that he had discontinued the Lithium. (AR 353.)  He was also mostly non-compliant in taking Seroquel, which had been prescribed by an outpatient psychiatrist. (AR 359.)  Plaintiff was referred to a partial hospitalization program. (AR 359.)  Plaintiff presented to the partial hospitalization program on August 1, 2014, but he had not slept all night and was sent to the emergency room for admission. (AR 418.)

///

On April 16, 2015, Plaintiff voluntarily admitted himself to a hospital in Pennsylvania for psychosis.  (AR 281, 417–53, 559.)  He had stopped taking his medications and had become manic.  (AR 559.)  After admission, he continued to be psychotic, stated he feared he was going to die, had disorganized thoughts, and was fearful.  (AR 417.)  He had difficulty answering direct questions and became preoccupied in semantics and thinking in metaphor.  (AR 417.)  He was discharged with prescriptions for Risperidone for schizoaffective disorder, Trazadone for insomnia, and hydroxyzine for anxiety.  He agreed to follow up with outpatient providers.  (AR 419, 559.)  Plaintiff was encouraged to seek alternative housing options as his mother appeared to have psychotic symptoms and her behavior was exacerbating Plaintiff's symptoms, but he stated he was going to stay with his mother.  (AR 420.)

By June 2015, Plaintiff's records indicate he had been diagnosed with acute bipolar disorder and ADHD, as well as chronic schizoaffective disorder, anxiety disorder, and insomnia.  (AR 558.)  On June 8, 2015, Plaintiff saw Muhammad Qamar, M.D. at American Family Psychiatry in Pennsylvania. (AR 557.)  He reported that his medications were helping him.  (AR 559.)  At the time, he was taking Vistaril for anxiety and panic disorder, Adderall for ADHD, Abilify for bipolar disorder and schizoaffective disorder, and Trazadone for insomnia.  (AR 491–92, 543–44, 549–50.)  Through January 2017, Plaintiff reported doing well on his medications.  (AR 482–562, 588–92, 614–55.)

On February 9, 2017, Plaintiff's mother reported that Plaintiff was not doing well as he had some paranoia and delusions.  (AR 610.)  Therefore, Dr. Qamar increased Plaintiff's Abilify prescription to 10mg daily.  (AR 610.)  At the time, Plaintiff was taking Vistaril for anxiety disorder and insomnia, Adderall for ADHD, and Abilify for bipolar and schizoaffective disorders.  (AR 611–12.)

Later in February 2017, Plaintiff was admitted to a psychiatric hospital in Pennsylvania because he was appearing psychotic and delusional.  (AR 605.)  He was ultimately stabilized, and in March 2017, he reported doing well on Abilify.  (AR 605.)  Plaintiff was also still taking Trazadone for insomnia.  (AR 606.)  Plaintiff reported that he

continued to do well on his medications in April and July 2017.  (AR 595, 600.)  However, in March 2018, Plaintiff was hospitalized in North Carolina, where he apparently moved to live with his father.  (AR 563, 658, 687, 730.)

On September 18, 2018, Dr. Qamar completed an evaluation of Plaintiff.  (AR 563–81.)  Plaintiff appeared angry, glum, sad looking, listless, irritable, wary, inattentive, distracted, communicative, disheveled, and tense.  (AR 577.)  He was showing signs of moderate depression, but the examination was otherwise normal.  (AR 577.)  Based on the information available to him, Dr. Qamar diagnosed Plaintiff with schizoaffective disorder, bipolar disorder, anxiety disorder, and insomnia.  (AR 577–78.)  Dr. Qamar determined that Plaintiff needed continued outpatient treatment and instructed him to continue taking Zyprexa, Topamax, and Vistaril.  (AR 579–80.)  Dr. Qamar stated that "[b]ased on [the] severity of psychotic symptoms and interference with functioning, [Plaintiff's] severity or complexity is considered moderate."  (AR 566.)  Dr. Qamar further stated that "[b]ased on the risk of morbidity without treatment and [Plaintiff's] description of interference with functioning [due to elevated mood and depression,] severity is estimated to be high."  (AR 564.)  Plaintiff reported living at the time in an assisted living facility.  (AR 573.)

On October 19, 2018, Plaintiff saw Dr. Qamar again.  (AR 582–87.)  Plaintiff was making progress, but still had some psychosis and disorganization of thoughts.  (AR 582–85.)  Although he had been compliant with his medication, Plaintiff's psychotic symptoms were reported as "intermittently present."  (AR 582.)  Plaintiff continued with his prior medications.  (AR 587.)

By February 2019, Plaintiff was homeless and living with his mother in her car.  (AR 657.)  They traveled cross-country and had recently arrived in San Diego, California.  (AR 657.)  On February 13, 2019, Plaintiff was seen by the County of San Diego Mental Health Services (the "County") and referred to the Emergency Psychiatric Unit because he was exhibiting symptoms of psychosis.  (AR 657.)  He reportedly stated that he "feels like someone is sending messages or he sees and knows more than what others sees [sic]— Paranoid."  (AR 657.)  During an assessment the following week, after he had taken

medication, Plaintiff noted that he had spent his entire life taking care of his mother, who he believed also had bipolar disorder, and he was very protective of her. (AR 657–59, 690.) He added that his mother was over-protective of him, which he felt prevented him from making a life for himself. (AR 658, 661, 690.)

The County determined that Plaintiff was "in need of psychiatry and supportive mental health services," noting his "inability to be employed since 2013, even though a college graduate, and his enmeshed relationship with his mother." (AR 682.) They further noted there was "[m]inimal evidence of an ability to work and be socially comfortable." (AR 660.) Although Plaintiff initially requested psychiatry services and medication, he subsequently decided he did not want any services. (AR 675–78.) On February 26, 2019, Plaintiff saw Scott Bunner, M.D., for a planned psychiatric assessment, but Plaintiff denied having a chronic or severe mental illness or symptoms. (AR 719.) He reported that his symptoms were infrequent and mild, and he only wanted medication to take as needed once a month or so. (AR 719.) He reported that he only occasionally took the medication he received from urgent care. (AR 719.) Plaintiff refused counseling and further services. (AR 719–21.)

On August 15, 2019, Plaintiff was hospitalized at the San Diego County Psychiatric Hospital for symptoms of psychosis and paranoia. (AR 686, 726.) He was brought in on a 5150 escorted by the San Diego police for grave disability. (AR 726.) His mother reported that he had been unable to care for himself, feed himself, or provide for himself. (AR 726.) He had not slept or eaten in thirty-six hours. (AR 726.) She further reported that Plaintiff had stopped taking his medications since his discharge from the hospital in North Carolina in March 2018. (AR 731.) Although Plaintiff had initially presented to the hospital voluntarily, he left the building while checking in and paced the parking lot for three hours. (AR 726.) He was nonresponsive, mute, and acting paranoid and disorganized. (AR 726.) His mother eventually flagged down police officers who escorted him through the front gate. (AR 726.) He was thereafter admitted and prescribed Prozac and Zyprexa/Olanzapine. (AR 686, 726.) He participated in all aspects of treatment and

was released on August 19, 2019, at which time he was assessed as "significantly improved." (AR 686, 726.)  However, his judgment at the time of discharge was assessed as poor with regards to his decision to discharge prior to his mental status returning to baseline and his decision to return to living in his mother's car.  (AR 727.)

The County offered continued inpatient psychiatric treatment on a voluntarily basis, but Plaintiff declined.  (AR 727.)  Ariana Nesbit, M.D., a staff psychiatrist, assessed Plaintiff as having a "fair prognosis if he continues taking his medications, avoids abusing recreational substances, and participates in rehabilitation programs; however, it does not bode well for him that he is refusing continued inpatient psychiatric treatment or a step down to a crisis house despite the fact that he is not back at his mental status baseline." (AR 728.)

On August 30, 2019, the County performed an initial Behavioral Health Assessment of Plaintiff.  (AR 686.)  He had been living between his mother's car and hotels for nearly eight months at that point.  (AR 686.)  Plaintiff's depressed mood was rated as a 7 out of 10, and his anxiety was rated as an 8 out of 10.  (AR 686.)  He reported audio hallucinations of his voice or a male voice dictating the meaning of life and collective consciousness. (AR 686.)  He also reported that he sees the sun and often finds meaning in the sun's shadow.  (AR 686.)  He reported that he had not been taking his Prozac and Zyprexa/Olanzapine consistently because they cause drowsiness.  (AR 686.)  The County recommended that Plaintiff have on-going out-patient treatment with medication management.  (AR 686.)  He was referred to Alpha Homefinders and follow-up for Medi-Cal and food stamps.  (AR 705.)

On September 6, 2019, Plaintiff went to the Emergency Department at UCSD Health in Hillcrest for disorganization, paranoia, and anxiety.  (AR 737, 748.)  Plaintiff reported that he had been taking his medications since his last discharge, but only half doses.  (AR 748.)  Hospitalization was recommended, but Plaintiff declined, and the hospital determined he did not meet the hold criteria.  (AR 737.)  He was released on September 7, with a prescription for Zyprexa/Olanzapine.  (AR 737.)  After he was released, he took the

prescribed medication and then awoke at 2:00 a.m. extremely anxious, which caused him to shut down.  (AR 737.)  Plaintiff became nonverbal and was not moving, so his mother called an ambulance.  (AR 737.)  He arrived at the Emergency Department at UCSD on September 8.  (AR 736.)  Although Plaintiff was initially non-verbal, after receiving Ativan, he was able to participate in an interview.  (AR 737.)  Plaintiff endorsed a feeling of "fear" of people who are after him, stating that these people are "larger than regular people," but he "doesn't know where the people are" so he is constantly looking around for them.  (AR 737.)  Plaintiff reported finding this feeling overwhelming.  (AR 737.)  He denied any hallucinations.  (AR 737.)  Plaintiff refused any hospitalization.  (AR 739.)  He was prescribed Zyprexa/Olanzapine and Ativan.  (AR 740.)

On September 13, 2019, Plaintiff was assessed by psychiatrist Gurpreet Ahluwalia, M.D.  (AR 708, 722.)  He was eating well and sleeping well at night, but still living in a car.  (AR 708.)  He complained of anxiety, psychosis, paranoia, and thought blocking.  (AR 708.)  He stated that he "sees things and . . . talk[s] to [himself] a lot."  (AR 708.)  He also stated that he feels "people are watching [him] and looking at [him] and talking about [him]."  (AR 708.)  He was started on Abilify for psychosis and mood swings, hydroxyzine for anxiety, and Trazadone for insomnia.  (AR 717.)

On October 9, 2019, Plaintiff saw Dr. Ahluwalia again.  (AR 724–25.)  He denied any depression, paranoia, and hallucinations.  (AR 724.)  He was alert and cooperative, with good memory and attention and fairly good eye contact, but his speech was loud and slightly pressured, his affect blunted, and his judgment and insight limited.  (AR 724.)  Dr. Ahluwalia continued Plaintiff's medications.  (AR 725.)

On January 14, 2020, Plaintiff underwent a Comprehensive Psychiatric Consultative Examination with Dr. Nicholson.  (AR 762–67.)  Plaintiff was living in a hotel at the time and appeared neatly and casually groomed, made good eye contact, and had good interpersonal contact.  (AR 764.)  Plaintiff's mood was depressed, and his affect was dysphoric, but the rest of his mental status examination was largely normal.  (AR 764–65.)
///

On March 13, 2020, Plaintiff saw Dr. Ahluwalia.  (AR 770–72.)  He stated he was still living in a motel room.  (AR 770.)  He reported that he was feeling "pretty good" and felt his medications were helping.  (AR 770.)  He had run out of his medications about two weeks earlier but was using his mother's medications.  (AR 770.)  Plaintiff reported sleeping well and denied any panic attacks, hallucinations, depression, or paranoia.  (AR 770–71.)  His judgment and insight were assessed as limited.  (AR 771.)  Plaintiff was smoking five marijuana "blunts" a day and drinking four to six beers a day.  (AR 770.)  Plaintiff was instructed to continue his prior course of treatment, which included taking Abilify, hydroxyzine, and Trazadone.  (AR 771.)

On October 13, 2020, Plaintiff completed an annual assessment with the North Central Mental Health Center by telephone due to COVID-19 protocols.  (AR 798–818.)  He stated that he was living in rotating hotel and motel rooms with his parents.  (AR 798.)  He stated that his symptom presentation impaired his ability to secure stable housing, obtain and maintain employment, and pursue further education.  (AR 798.)  Plaintiff presented with a stable mood, clear and coherent speech, and good tracking.  (AR 798.)  He reported that he experiences anxiety, helpless/hopeless feelings, audio hallucinations, isolation, ruminating thoughts, and difficulty concentrating.  (AR 798.)  He reported that his anxiety comes in waves and is his most notable/problematic symptom.  (AR 798.)  Plaintiff was "proudly hospital free the past 12 months."  (AR 798.)  Plaintiff reported daily use of marijuana and alcohol.  (AR 798.)  Plaintiff reported that he feels the marijuana helps him sleep and manage his anxiety.  (AR 798.)

On November 20, 2020, Plaintiff saw Dr. Ahluwalia by telephone due to COVID-19 protocols.  (AR 796–97.)  He stated he was living in a motel room with his mother and father and felt it was working out well.  (AR 796.)  He was getting his medicines delivered to his parents.  (AR 796.)  Plaintiff reported sleeping well and denied any anxiety, depression, mood swings, hallucinations, or psychosis.  (AR 796.)  Plaintiff was smoking seven to eleven marijuana "blunts" per day and drinking four to six beers per day.  (AR 796.)  Plaintiff was instructed to continue his prior course of treatment.  (AR 797.)

On April 16, 2021, Plaintiff saw Dr. Ahluwalia by telephone due to COVID-19 protocols.  (AR 820–21.)  He stated he was living in a motel room with his mother.  (AR 820.)  Plaintiff reported feeling "pretty good."  (AR 820.)  Plaintiff reported sleeping well and denied any depression, mood swings, hallucinations, or psychosis.  (AR 820–21.)  However, he admitted to feeling moody and irritable and having anxiety and some paranoia.  (AR 821.)  His judgment and insight were assessed as limited.  (AR 821.)  Plaintiff felt a higher dose of Abilify (15 mg) was helping to control his mood and paranoia and the voices.  (AR 820.)  Plaintiff reported smoking seven to ten marijuana "blunts" per day and drinking four to six beers per day.  (AR 821.)

The last treatment note of the record is from July 20, 2021.  On that date, Plaintiff saw Dr. Ahluwalia by telephone due to COVID-19 protocols.  (AR 843–44.)  He stated he had moved to a new apartment with his parents, and it felt like home.  (AR 843.)  Plaintiff reported feeling "good."  (AR 843.)  Plaintiff reported sleeping well and denied any depression, mood swings, hallucinations, paranoia, or psychosis.  (AR 843.)  However, he reported some anxiety and requested a higher dose of hydroxyzine.  (AR 843.)  His judgment and insight were assessed as limited.  (AR 844.)  Plaintiff reported smoking eight marijuana "blunts" per day and drinking four beers per day.  (AR 843.)  Dr. Ahluwalia continued Plaintiff's Abilify and Trazodone and increased his hydroxyzine to 100mg.  (AR 844.)

### 2.    Summary of Plaintiff's Symptom Testimony

#### a.    *Administrative Hearing Testimony*

At the administrative hearing held on September 13, 2021, Plaintiff testified as follows:

Plaintiff is a twenty-eight-year-old man with a bachelor's degree.  (AR 45.)  He lives in an apartment with his mother and does not have a driver's license.  (AR 46.)  Plaintiff tries to "avoid [driving] as much as possible," instead taking the bus or having his mother drive him.  (AR 52.)

///

1   Plaintiff was diagnosed with bipolar condition and schizoaffective disorder in
2   April 2015. (AR 50.) He has difficulty finishing things that he has started and, prior to his
3   diagnosis, would "hear voices." (AR 50.) Plaintiff continues to have delusions that people
4   are out to get him. (AR 51.) He experiences "crippl[ing]" periods of anxiety approximately
5   once a month or every other month. (AR 48.) During his panic attacks, Plaintiff
6   experiences "delusions" and feelings of impending doom. (AR 49.) Oftentimes, Plaintiff
7   has difficulty concentrating and staying focused, but he is unsure if he has memory trouble
8   and, although his delusions make it "hard to . . . maintain" friends, he does not have much
9   difficulty getting along with people. (AR 46-51.) Plaintiff takes three types of anti-anxiety
10  and sleep medications. (AR 47.)

11  Plaintiff is currently unemployed and is not seeking employment because he recently
12  went through a period of "heavy drinking" and homelessness. (AR 45-47.) Additionally,
13  he worries that his panic and anxiety attacks would interfere with potential responsibilities
14  and his ability to work. (AR 51.) In 2012 and 2013, Plaintiff worked at Chipotle for six
15  months as a cashier and doing dishes. (AR 45–46.) This is the only job he has had in the
16  last fifteen years. (AR 45; *see also* AR 258–59.) Instead of working, Plaintiff spends his
17  day listening to music, watching movies, or playing video games. (AR 47.) He does not
18  perform any household chores besides taking out the trash. (*Id.*)

19  Up until a year and a half ago, Plaintiff had nine hospitalizations for mental health
20  reasons. (AR 52.) Although Plaintiff has become "more acquainted" with his condition
21  over the years, he believes that it is "getting worse," as he did not hear voices early on.
22  (AR 53.) He admitted to smoking marijuana the morning of the administrative hearing and
23  drinking alcohol the night before. (AR 47.) He does not believe that his mental health
24  condition would improve if he were to stop using marijuana and alcohol because they "help
25  [his] mood." (AR 47.)

26  b.  *Function Report*

27  Plaintiff submitted a Function Report, dated November 30, 2020. (AR 313–20.) In
28  the Function Report, Plaintiff stated that he lives in a hotel with his family and his ability

to work is limited by his psychosis and schizophrenia.  (AR 313.)  His mental conditions do not allow him to sleep or concentrate.  (AR 314.)  Additionally, his mental conditions have affected his memory, understanding, moods, and ability to follow instructions and get along with others.  (AR 318.)

Due to an inability to concentrate and focus, Plaintiff does not perform household chores.  (AR 315.)  Furthermore, Plaintiff cannot handle a savings account or use a checkbook.  (AR 316.)  From the time that he wakes up until he goes to bed, Plaintiff spends his time using the bathroom, pacing, and listening to music.  (AR 314.)  He bathes every three to four weeks and can prepare frozen dinners, but someone else cares for his hair and cooks for him.  (AR 314.)  He needs reminders to bathe, eat, and take his medication.  (AR 315.)

Every one to two weeks, Plaintiff goes outside.  (AR 316.)  When going out, Plaintiff travels by walking or riding in a car, accompanied by his mother.  (AR 316.)  He interacts with others through texting, playing games, or talking on the phone.  (AR 317.)

Plaintiff does not follow written instructions well and cannot focus when orally instructed.  (AR 318.)  While working at Chipotle, Plaintiff was often threatened with getting fired.  (AR 318.)  He does not handle stress or changes in routine well and has a fear of getting stuck in cars.  (AR 319.)  Plaintiff wears glasses prescribed by a doctor in 2010 for distance.  (AR 319.)  He currently takes three medications for his conditions: Abilify, Atarax, and Trazadone.  (AR 320.)  He experiences drowsiness from all three medicines and sleepiness from the latter two.  (AR 320.)

**B.    The ALJ Erred in Discounting Plaintiff's Symptom Testimony**

1.    Parties' Arguments

Plaintiff argues that the ALJ did not provide specific, clear, and convincing reasons for discounting his symptom testimony regarding his mental impairments.  (ECF No. 16 at 13.)  Specifically, he argues that the ALJ used "routine boilerplate language," rather than the requisite detailed discussion, to find that Plaintiff's statements regarding the "intensity, persistence[,] and limiting effects of [his] symptoms" were inconsistent with the medical

evidence and other evidence in the record. (*Id.*) Plaintiff claims that his testimony "aligned with the medical evidence" on record which documented a "long history of treatment for schizophrenia, schizoaffective disorder, and bipolar disorder with psychotic features." (*Id.* at 7.) Additionally, Plaintiff claims that the ALJ's reasons for discounting his symptom testimony–*i.e.*, he "responded well to psychiatric medications" and was "capable of a wide range of activities of daily living," are not clear, convincing, or well-supported by evidence in the record. (*Id.* at 16.)

In opposition, the Commissioner argues that the ALJ "identified evidence showing that when Plaintiff complied with treatment recommendations, he improved dramatically." (ECF No. 18 at 3.) Specifically, the Commissioner argues that "Plaintiff was not always compliant with treatment," despite its "apparent utility." (*Id.* at 5.) Accordingly, the Commissioner claims that Plaintiff's claims regarding the severity of his disabling symptoms were undermined by his "medication non-adherence." (*Id.* at 6.)

## 2. Legal Standard

The ALJ must engage "in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). At the first step, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms allege." *Id.* (internal quotation marks and citation omitted).

If the claimant satisfies the first step, and there is no determination of malingering by the ALJ, "the ALJ must provide 'specific, clear, and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)); *see also Garrison*, 759 F.3d at 1014–15; *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). The Ninth Circuit "require[s] the ALJ to 'specifically identify the testimony [from a claimant] [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony.'" *Id.* (quoting *Holohan v.*

*Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)); *see also Lambert v. Saul*, 980 F.3d 1266, 1268 (9th Cir. 2020) ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining."); *Smolen*, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); *Parra*, 481 F.3d at 750 ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints." (internal quotation marks and citation omitted)).

### 3.   Analysis of ALJ's Reasons for Rejecting Symptom Testimony

Plaintiff alleges that he is limited in his ability to work by his schizophrenia, schizoaffective disorder, ADHD, psychosis, anxiety, and panic attacks. (AR 276; *see also* AR 26, 59, 313.) After reviewing Plaintiff's testimony and the medical record, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 27.) However, the ALJ rejected Plaintiff's symptom testimony because his statements "concerning the intensity, persistence, and limiting effects of the alleged symptoms are not entirely consistent with the medical evidence or other evidence in the record." (AR 27.)[2]

As the ALJ made no finding of malingering, the Court must determine whether the ALJ provided clear, specific, and convincing reasons for disregarding Plaintiff's subjective symptom testimony. *See Treichler*, 775 F.3d at 1102. The ALJ did not point to any specific symptom testimony that he found not credible. Instead, after detailing Plaintiff's medical

---

[2]   In determining Plaintiff's RFC, the ALJ considered Plaintiff's history of polysubstance abuse, but found it was immaterial to the disability determination, as Plaintiff would have limitations associated with the other mental impairments regardless of the substance abuse. (AR 31.) He also noted that the "effects of [Plaintiff's] current and past substance abuse appear to cause modest impact on his concentration and memory." (AR 31.)

history, evaluating the medical opinions, and assessing Plaintiff's mother's testimony, the ALJ simply stated in a conclusory paragraph:

> Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the objective medical evidence, discussed above. The undersigned recognizes that the claimant has schizoaffective disorder, bipolar type, ADHD, depressive disorder, anxiety disorder, unspecified type, and polysubstance abuse, which can affect his concentration and focus. However, the claimant has also not shown any mental or adaptive deficits consistent with those of a disabled person (see for example, Exs. 1F/5-6, 31-32, 55; 2F/2-4, 58, 63; 3F/3, 9, 15, 21, 26, 31, 36, 41, 46, 56, 67, 73; 4F/20-21, 33, 38, 43, 48, 54, 60, 64, 66, 68, 72, 78, 84, 88, 90; 5F/59-60, 64, 69, 71; 6F/4-5, 14-16; 7F/3-4; 8F/2-3; 9F/2, 4, 17-18; 10F/2; and, 11F/1-2). In fact, the evidence demonstrates he is capable of a wide range of activities of daily living. He also responded well to psychiatric medications prescribed by his mental health specialist. While the claimant's conditions may cause him to have some restrictions and limitations with work related activities, the evidence in file indicates that those limitations are not severe enough to keep him from working within the residual functional capacity assessed in this decision.

(AR 34.)

Based on the foregoing paragraph, the Court construes the ALJ's decision as discounting unspecified symptom testimony for the following two reasons: (1) Plaintiff responded well to the psychiatric medications prescribed by his mental health providers; and (2) Plaintiff is capable of a wide range of activities of daily living. The Court addresses each reason below.

### a. *Response to Psychiatric Medications*

The ALJ discounted Plaintiff's subjective symptom testimony because Plaintiff allegedly "responded well to psychiatric medications prescribed by his mental health specialist." (AR 34.) Although the ALJ did not cite to specific treatment notes in his discussion of Plaintiff's symptom testimony, in discussing Plaintiff's medical history, he noted that Plaintiff generally feels "pretty good" when regularly taking his medications. (AR 27–31.) For the reasons discussed below, the Court finds that this is not a clear and

convincing reason for discounting Plaintiff's testimony regarding the severity of his symptoms.

In assessing the credibility of a claimant's subjective symptom testimony, an ALJ may consider whether the claimant had a "fair response" to medication or treatment. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983); *see also* 20 C.F.R. § 404.1529(c)(3)(v) (listing the treatment an individual has received for relief of pain or other symptoms as a factor the ALJ may consider in evaluating symptoms); 20 C.F.R. § 416.929(c)(3)(v) (same). Evidence that a claimant's condition has been consistently managed or corrected by medication may undermine subjective complaints of disabling limitations. *See Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (suggesting that evidence of medical treatment successfully relieving symptoms such that the individual can return to a level of function close to the level of function they had before they developed the symptoms or signs of mental disorders can undermine a claim of disability); *William K. v. Saul*, No. 2:18-cv-05408-GJS, 2019 WL 4466789, at *3 (C.D. Cal. Sept. 18, 2019) (holding that the ALJ properly relied on claimant's ability to control symptoms with medication where last four examinations were consistently normal and no treatment adjustments were needed). However, when assessing mental health issues, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison*, 759 F.3d 995 at 1017. With respect to mental health issues, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id.*

Here, the medical evidence reflects that Plaintiff's condition improved when he followed a prescribed treatment plan. Prior to January 2020, Plaintiff had been hospitalized nine times. (AR 763.) However, several of Plaintiff's hospitalizations appear to have

followed a period of non-compliance with his medications.  (*E.g.*, AR 383, 359, 559, 719, 731, 686, 748.)   When Plaintiff was reportedly compliant with his medications, he responded well to treatment.

After he was hospitalized in April 2015, Plaintiff reported doing generally well on his medications for approximately two years.  (*E.g.*, AR 482–562, 588–92, 614–55.)   In February 2017, despite reportedly taking his medications as prescribed, Plaintiff was admitted to a psychiatric hospital when he became "very psychotic and delusional."  (AR 605, 610.)   However, he was stabilized and on March 2, 2017, Dr. Qamar noted that "[s]ince [Plaintiff] has been taking meds regularly, [he] is making progress and [his] symptoms are improving daily."  (AR 605.)  Plaintiff thereafter continued to do well on his medications in April and July 2017.  (AR 595, 600.)

In 2018, Plaintiff was hospitalized in North Carolina, but it appears he may have stopped taking his medications around that time.  (AR 563, 658, 687, 730, 731.)   In late 2018, Plaintiff was reportedly back on his medications, but his psychotic symptoms were still "intermittently present."  (AR 582–85.)  As of February 2019, Plaintiff was homeless and living with his mother out of her car and had recently arrived in San Diego.  (AR 657.)   On February 13, 2019, the County referred him the Emergency Psychiatric Unit for exhibiting symptoms of psychosis.  (AR 657.)[3]  He reported that he only occasionally took the medication he received from urgent care and declined further services.  (AR 719–21.)   In August 2019, Plaintiff was hospitalized for symptoms of psychosis and paranoia, after being brought in on a 5150 hold.  (AR 686, 726.)  Plaintiff's mother reported that he had not been taking his medications since his discharge from the hospital in North Carolina in March 2018.  (AR 731.)  At the time of release, Dr. Nesbit assessed Plaintiff as having a

---

[3]     At the same time he was assessed as having psychotic symptoms, Plaintiff self-reported that his symptoms were infrequent and mild, and he only wanted medication to take as needed once a month or so.  (AR 719.)   Therefore, it is unclear to what extent Plaintiff is a reliable narrator.

"fair prognosis if he continues taking his medications, avoids abusing recreational substances, and participates in rehabilitation programs; however, it does not bode well for him that he is refusing continued inpatient psychiatric treatment or a step down to a crisis house despite the fact that he is not back at his mental status baseline." (AR 728.)

In August and September 2019, Plaintiff continued to experience hallucinations, depression, anxiety, paranoia, and disorganization and presented to the emergency room. (AR 686, 737, 748.) He reported that he had not been taking his medications consistently or was only taking half doses. (AR 686, 748.) Beginning in March 2020, Plaintiff reported feeling "pretty good" and felt his medications were helping. (AR 770.) In October 2020, Plaintiff was "proudly hospital free the past 12 months," but still experienced anxiety, helpless/hopeless feelings, audio hallucinations, isolation, ruminating thoughts, and difficulty concentrating. (AR 798.) He noted that his anxiety comes in waves. (AR 798.) Plaintiff further reported doing well in November 2020 and April 2021. (AR 796–97, 820–21.) In November 2020, he reported sleeping well and denied any anxiety, depression, mood swings, hallucinations, or psychosis. (AR 796.) However, in April 2021, Plaintiff admitted to feeling moody and irritable and having anxiety and some paranoia. (AR 821.) His judgment and insight were assessed as limited. (AR 821.)

On July 20, 2021, according to his last treatment note of record, Plaintiff reported sleeping well and denied any depression, mood swings, hallucinations, paranoia, or psychosis. (AR 843.) However, he reported some anxiety and requested a higher dose of hydroxyzine. (AR 843.) His judgment and insight were still assessed as limited. (AR 844.)

Based upon this treatment history, the ALJ discounted Plaintiff's symptom testimony because Plaintiff responds well to his medications. However, the ALJ did not specify, as required, which testimony he found not to be credible. *See Lambert*, 980 F.3d at 1268 ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining."); *Treichler*, 775 F.3d at 1102 (requiring the ALJ to specifically identify the testimony he finds not to be credible and explain what evidence undermines

this testimony).  This requirement is particularly critical here, where "responding well" to medications is a relative thing.[4]  Per the treatment records, when Plaintiff is not consistently taking his medications, his symptoms become so severe he has frequently required hospitalization.  Yet even when he is taking his medications, the medical records reflect that he has periods of moodiness, irritability, anxiety, paranoia, hallucinations, ruminating thoughts, difficulty concentrating, and helpless/hopeless feelings.  He also still feels the need to self-medicate with alcohol and marijuana, and his doctor consistently assessed him as having limited insight and judgment.  Moreover, as discussed below, even when Plaintiff is "responding well" to medications, his daily activities are extremely limited.

In light of this, in the absence of the ALJ articulating which symptom testimony he is discounting, based upon which medical records, the Court cannot find this to be a "specific, clear, and convincing reason" for discounting Plaintiff's subjective symptom testimony.  *Smolen*, 80 F.3d at 1281.[5]

### b.  *Daily Activities*

The next reason cited by the ALJ for discounting Plaintiff's subjective symptom testimony is that the evidence demonstrates that Plaintiff "is capable of a wide range of activities of daily living."  (AR 34.)  In his decision, the ALJ described Plaintiff's activities of daily living as follows:

> [Plaintiff] goes to the bathroom, paces, and listens to music; he bathes every 3–4 weeks; he can prepare frozen dinners; he does not do any housework; he walks and rides in a car, but he cannot go out alone and he does not drive; he does not do any shopping; he does not pay bills, count change, handle a

---

[4]  *See Garrison*, 759 F.3d at 1017–18 ("Reports of improvement in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of [his] symptoms." (internal quotation marks and citation omitted)).

[5]  *See Malkin v. Saul*, 818 F. App'x 738, 739 n.1 (9th Cir. 2020) (noting that "existing precedents make clear that, after determining whether the ALJ's factual findings are supported by substantial evidence, [courts] should then take the additional step of asking whether those facts give rise to clear and convincing reasons for discrediting the claimant's symptom testimony." (internal quotation marks and citations omitted)).

savings account or use a checkbook due to lack of focus; his hobby is music; he has problems getting along with family and friends, but he texts, talks to, and plays video games with others.

(AR 26.)  The ALJ also noted that, during the day, Plaintiff "watches movies or plays video games," "takes the trash out," and has indicated he "will start trying to clean the bathroom." (AR 26.)  Plaintiff has "some basic friends," but finds it hard to maintain them because "he thinks they are out to get him."  (AR 27.)  Plaintiff has never had a driver's license and "either gets a ride from his mother or takes a bus."  (AR 27.)  Plaintiff also frequently smokes marijuana and drinks alcohol during the day.  (AR 26–31.)  For the reasons set forth below, the Court finds that this reason is not a specific, clear, and convincing reason for discounting Plaintiff's subjective symptom testimony.  *Smolen*, 80 F.3d at 1281.

"Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."  *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014); *see also Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) ("[I]nconsistent daily activities may provide a justification for rejecting symptom testimony[.]"); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (stating that a contradiction between a claimant's daily activities and his or her testimony is a ground for forming the basis of an adverse credibility determination).  In other words, a court may consider inconsistencies between a claimant's words and her actions.  *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989), *superseded on other grounds by* 20 C.F.R. § 404.1502(a); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").  However, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  A claimant "does not need to be utterly incapacitated in order to be disabled."  *Id.* (internal quotation marks and citation omitted).

Daily activities may also "be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'"   *Orn*, 495 F.3d at 639 (quoting *Fair*, 885 F.2d at 603).   To meet this standard, the ALJ "must make 'specific findings relating to [the daily] activities' and their transferability [to a work setting] to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

Here, the ALJ did not identify any inconsistencies between Plaintiff's symptom testimony and his daily activities to support an adverse credibility finding.  The Court finds that Plaintiff's daily activities are consistent with his symptom testimony.  Plaintiff claims he cannot concentrate or focus and has frequent panic attacks and crippling periods of anxiety.  (AR 48, 315.)  As a result, he cannot perform household chores, handle a savings account, or use a checkbook.  (AR 315–16.)  He only bathes every three to four weeks, needs assistance with grooming and personal care, only spends thirty minutes a week warming up frozen meals, does not drive, and needs constant reminders to bathe, eat, and take his medication.  (AR 314–16.)  Frequently, Plaintiff's only daily activities include going to the bathroom, listening to music, and "pacing all day." (AR 306.)  The ALJ does not identify any specific daily activity that is inconsistent with Plaintiff's claimed mental limitations.  Rather, the ALJ only generally states that "the claimant's conditions may cause him to have some restrictions and limitations with work related activities," but they are not severe enough to keep him from working within the assessed RFC.  (AR 34.)  This is insufficient to meet the clear and convincing burden.

The ALJ also did not make specific findings relating to the cited daily activities and their transferability to a work setting.   An ALJ may justifiably disregard symptom testimony if a claimant can spend a "substantial part of his day" engaged in activities involving the performance of functions "transferable to a work setting." *Fair*, 885 F.2d at 603.  Here, the ALJ described an individual who does minimal daily activities, only bathes every three to four weeks, cannot go out alone, cannot focus, cannot handle basic functions

such as shopping or paying the bills, and cannot handle stressful situations without marijuana and alcohol.  (AR 26.)  This does not suggest an individual capable of substantial gainful activity.[6]  Moreover, nothing indicates that Plaintiff's daily activities of listening to music, watching movies, and playing video games are activities that are transferable to a work setting in any meaningful way.  *See, e.g.*, *Orn*, 495 F.3d at 639 (finding that reading, watching television, and coloring were not skills transferable to work setting).   For example, although Plaintiff listens to music, he does so while "pacing all day."  (AR 306.)  Additionally, the time Plaintiff spends performing other activities, such as warming up food and taking out the trash, is minimal.  (AR 47, 315.)  He spends thirty minutes weekly warming up frozen meals and there is no indication how often he takes out the trash.  *See, e.g.*, *Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) (finding house chores and cooking simple meals "are not similar to typical work responsibilities").

For the foregoing reasons, the Court finds that Plaintiff's alleged "wide range of activities of daily living" is also not a specific, clear, and convincing reason for discounting Plaintiff's subjective symptom testimony.  *Smolen*, 80 F.3d at 1281.  Because the ALJ did not provide any specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony, he committed reversible error.

///

///

---

[6]     *See* 20 C.F.R. §§ 404.1505, 416.905 (disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months"); *id.* §§ 404.1510, 416.910 ("Substantial gainful activity means work that . . . [i]nvolves doing significant and productive physical or mental duties; and . . . [i]s done (or intended) for pay or profit."); *id.* §§ 404.1545(c), 416.945(c) (an ALJ assessing a claimant's mental activities must determine the claimant's RFC "for work activity on a regular and continuing basis"); *cf. id.* § Pt. 404, Subpt. P, App. 1, § 12.00(F)(4)(a) (in assessing the "paragraph B" criteria, an ALJ must consider whether the claimant "can use the area of mental functioning on a regular and continuing basis (8 hours a day, 5 days a week, or an equivalent work schedule")).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.    The ALJ Erred in Evaluating Dr. Nicholson's Opinion

#### 1.    Parties' Arguments

Plaintiff argues that the ALJ erred in discounting the moderate mental limitations assessed by Dr. Nicholson because the discounted opinions in Dr. Nicholson's psychiatric evaluation were supported by his own assessment, Plaintiff's self-endorsed symptoms, and the most recent treatment record reviewed by Dr. Nicholson.  (ECF No. 16 at 20–21.) Plaintiff further argues that Dr. Nicholson's opinion was consistent with the other evidence of record and the ALJ failed to address this factor.  (*Id.* at 21–23.)  In sum, Plaintiff argues that the ALJ failed to properly evaluate and articulate the consistency and supportability factors with regarding to Dr. Nicholson's assessment of moderate mental limitations.  (*Id.* at 23.)

In response, Defendant argues that the ALJ reasonably determined that the portion of Dr. Nicholson's opinion which assessed moderate mental limitations was "less persuasive." (ECF No. 18 at 6.)  Defendant contends that this part of the opinion was less persuasive because the "objective evidence did not support Dr. Nicholson's opinion." (*Id.* at 7.)   Additionally, Defendant argues that the treatment records that Dr. Nicholson reviewed did not form the basis for his opinion because the doctor "explicitly stated" that his functional assessment was "[b]ased on the examination today."  (*Id.*; *see also* AR 766.)

#### 2.    Legal Standard

Under the revised regulations which apply to claims, such as this one, filed on or after March 27, 2017, an ALJ must evaluate the persuasiveness of all the medical opinions and articulate in the decision his or her assessment as to each.  *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  In evaluating the persuasiveness of a medical opinion, an ALJ will consider the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length, purpose, and extent of the treatment relationship, frequency of examinations, and examining relationship; (4) specialization; and (5) any other factors that tend to support or contradict the medical opinion, including familiarity with the other evidence in the claim.  *See id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

Although an ALJ may discuss each of the factors to be considered in his or her opinion, the regulations only require an ALJ to explain how he or she considered the most important factors—supportability and consistency—when determining a medical opinion's persuasiveness, unless two conflicting medical opinions are both equally well-supported and consistent with the record.  *See id.* §§ 404.1520c(b)(2)–(3), 416.920c(b)(2)–(3).

The revised regulations override the Ninth Circuit's treating physician rule, which accorded greater deference to the opinions of treating physicians due to their relationship with the claimant.  The treating physician rule required clear and convincing reasons for rejecting an uncontradicted medical opinion of a treating physician, and specific and legitimate reasons for rejecting a contradicted medical opinion of a treating physician.  *Woods v. Kijakazi*, 32 F.4th 785, 789–92 (9th Cir. 2022).  However, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."  *Id.* at 792; *accord Petritz v. Kijakazi*, No. 22-35155, 2022 WL 17592191, at *1 (9th Cir. Dec. 13, 2022); *Jones v. Saul*, No. 2:19-cv-01273 AC, 2021 WL 620475, at *6 (E.D. Cal. Feb. 17, 2021).

In evaluating the persuasiveness of medical opinions, the "most important factors" are "supportability" and "consistency."  *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a); *see also Woods*, 32 F.4th at 791.  Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant . . . objective medical evidence."  *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  Consistency means the extent to which a medical opinion is "consistent . . . with the evidence from other medical sources and nonmedical sources in the claim."  *See id.* §§ 404.1520c(c)(2), 416.920c(c)(2).  An ALJ must "articulate . . . how persuasive" he or she finds "all of the medical opinions" from each doctor or other source, and "explain how [her or she] considered the supportability and consistency factors" in reaching these findings.  *See id.* §§ 404.1520c(b), 416.920c(b).

///

///

### 3.   Summary of Dr. Nicholson's Opinion

On January 14, 2020, Plaintiff met with psychiatrist Dr. Nicholson for a Comprehensive Psychiatric Evaluation. (AR 762.) Plaintiff's mother drove him to the appointment and he "was able to provide picture ID as he checked in for the appointment." (AR 762.) Dr. Nicholson noted that Plaintiff "appeared to be a reliable historian." (AR 762.)

Plaintiff's chief complaint was depression. (AR 762.) He reported feeling depressed about financial problems, being bothered by auditory hallucinations "commanding him to pull his hair out," and experiencing episodes in the past where he felt "overly alert and paranoid." (AR 763.) During those episodes, Plaintiff experienced "decreased need for sleep and racing thoughts." (AR 763.) Plaintiff stated that he recently felt depressed, endorsing insomnia, decreased energy, trouble concentrating, and a decreased interest in normal activities. (AR 763.)

Dr. Nicholson diagnosed Plaintiff with psychotic disorder based on Plaintiff's prior history of hallucinations and paranoia, and bipolar disorder based on Plaintiff's "current history" of depression and prior history of mania or hypomania. (AR 765–66.) Dr. Nicholson indicated he reviewed treatment records dated September 13, 2019, which listed diagnoses of schizoaffective disorder and bipolar disorder. (AR 762.)[7] Plaintiff also reported a family history of bipolar disorder. (AR 763.)

Plaintiff reported taking three psychiatric medications: Abilify, hydroxyzine, and trazodone. (AR 763.) He also reported "occasionally us[ing] alcohol and cannabis but

---

[7]   Dr. Nicholson stated that his functional assessment was "[b]ased on [his] examination," but Plaintiff points out that the September 13, 2019 treatment notes reviewed by Dr. Nicholson indicate that Plaintiff had ongoing depression and anxiety, poor hygiene, a malodorous and disheveled appearance, slow speech, tangential thought process, restricted affect, an anxious mood, difficulty concentrating, limited judgment, marginal insight, visual hallucinations, and paranoid delusions. (ECF No. 16 at 20–21 (citing AR 708–09, 714–15, 762).) These treatment notes consisted of an 11-page psychiatric assessment from the County of San Diego Mental Health Services. (*See* AR 708–18.)

denied any history of problems in his life related to alcohol or cannabis." (AR 763.) Plaintiff stated that he last held a job as a restaurant server in 2013. (AR 764.) However, he stopped working to resume attending college. (AR 764.) He currently lives in a hotel where his mother cooks and does the laundry. (AR 764.) Although he was experiencing "no difficulty with dressing, bathing or hygiene," Plaintiff does not drive "because he does not have a license." (AR 764.)

During Plaintiff's mental status examination, Dr. Nicholson noted that Plaintiff "was neatly and casually groomed," made eye contact, and "was generally cooperative." (AR 764.) Plaintiff volunteered information spontaneously; "[t]here was no psychomotor agitation or retardation." (AR 764.) There was no evidence of manipulation, as Plaintiff seemed to be "genuine and truthful." (AR 764.) Plaintiff "did not appear to be under the influence of drugs or alcohol." (AR 764.) Dr. Nicholson noted that Plaintiff's thought processes appeared "coherent and organized." (AR 764.) Plaintiff denied any plan to harm himself or others and "did not appear to be responding to internal stimuli during the interview." (AR 764.)

Dr. Nicholson assessed Plaintiff's mood as depressed and his affect as dysphoric, although "he was not tearful." (AR 765.) Dr. Nicholson noted that Plaintiff appeared to be alert and of average intelligence, with a "grossly intact" fund of knowledge, insight, and judgment. (AR 765.) Plaintiff was able to spell "world" forward correctly, but when asked to spell it backward, he spelled it "d-l-o-r-w." (AR 765.) Plaintiff could perform serial threes and "correctly stated that 80 cents would be received from a dollar if two oranges were bought at 10 cents each." (AR 765.) His speech was "normally and clearly articulated." (AR 765.)

Dr. Nicholson assessed that Plaintiff's condition was "expected to improve in the next twelve months with active treatment." (AR 766.) Furthermore, Dr. Nicholson opined that Plaintiff is able to understand, remember, and carry out simple one- or two-step job instructions, and is able to do detailed and complex instructions. (AR 766.) He further opined that Plaintiff was mildly limited in his ability to maintain concentration, attention,

persistence, and pace, to accept instructions from supervisors, and to maintain regular attendance and perform work activities on a consistent basis.  (AR 766.)  Lastly, Dr. Nicholson opined that Plaintiff was moderately limited in his ability to relate and interact with coworkers and the public, and to perform work activities without special or additional supervision.  (AR 766.)

### 4.   Analysis

In his decision, the ALJ determined that Dr. Nicholson's opinion was "overall persuasive."  (AR 33.)  However, he found the following portion of Dr. Nicholson's opinion to be less persuasive: "[Plaintiff] has moderate limitation in the abilities to relate and interact with coworkers and the public and perform work activities without special or additional supervision; and, he has no limitation in the ability to do detailed and complex instructions."  (AR 33.)  The ALJ found this portion of the opinion to be "less persuasive" because

> it is not supported by Dr. Nicholson's mental status examination findings of: neatly and casually groomed; good eye contact; cooperative behavior; normal speech; able to recall three words immediately and two words after five minutes and three words with hints; digit span was six forward and three backward; and, able to spell 'world' forward, but not backwards, [as] discussed above.

(AR 33.)

Based on the foregoing, the Court finds that the ALJ adequately addressed the supportability factor with respect to the portion of Dr. Nicholson's opinion he found "less persuasive."  (AR 33.)  The ALJ identified the basis for his finding that Dr. Nicholson's opinion was not supported by relevant objective medical evidence, *i.e.*, that Dr. Nicholson's opinion was based on his own examination of Plaintiff.  (AR 33.)  However, the ALJ did not address the consistency factor with respect to the portion of Dr. Nicholson's opinion he found "less persuasive."  (AR 33.)  The ALJ did not address how consistent this portion of Dr. Nicholson's opinion is with "evidence from other medical sources and nonmedical sources."  *See* 20 C.F.R. §§ 404.1520c(c)(2),

416.920c(c)(2).[8]  An ALJ errs when he does not address both factors.  *See Kimberli M. S. v. Kijakazi*, No. 21-cv-1836-AJB-MDD, 2023 WL 2346330, at *7 (S.D. Cal. Mar. 3, 2023) (holding the ALJ's evaluation of medical opinions was inadequate where only consistency factor, and not supportability factor, was articulated); *see also Woods*, 32 F. 4th at 792 ("The agency must . . . explain how [it] considered the supportability and consistency factors[.]" (citation omitted)); *Johnson v. Kijakazi*, No. 21-15919, 2022 WL 2593516, at *1 (9th Cir. July 8, 2022) (an ALJ should set out analysis of both supportability and consistency factors, and any other relevant factors).

In conducting its harmlessness analysis, the Court here addresses each portion of the improperly rejected opinion separately.  With respect to the improperly rejected portion of Dr. Nicholson's opinion that Plaintiff has no limitation in the ability to do detailed and complex instructions, this error is harmless.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (defining harmless error as such error that is "inconsequential to the ultimate nondisability determination").  The ALJ found persuasive Dr. Nicholson's opinion that Plaintiff is able to understand, remember, and carry out simple one or two-step job instructions, and incorporated this opinion into the RFC.  (AR 25 ("he can understand, remember, and carry out simple job tasks and simple job instructions").) Plaintiff does not argue that this limitation is unsupported by substantial evidence.

Similarly, with respect to the improperly rejected portion of Dr. Nicholson's opinion that Plaintiff has moderate limitation in the abilities to relate and interact with coworkers and the public, the ALJ's error is harmless.  *See Stout*, 454 F.3d at 1055.  In the RFC, the ALJ limited Plaintiff to "no public contact," and although Plaintiff can "interact appropriately with coworkers and supervisors," this interaction "must be noncollaborative and have no teamwork."  (AR 25.)  Therefore, although the ALJ found Dr. Nicholson's moderate limitations to be "less persuasive," he incorporated such limitations into the RFC.

---

[8]     The Court notes that the ALJ addressed both the consistency and supportability factors as to the portion of Dr. Nicholson's opinion he found persuasive.  (*See* AR 33.)

Notably, the fifth digit of the Dictionary of Occupational Titles ("DOT") occupational code for each of the jobs identified by the VE is "8," which indicates that these jobs involve the lowest level of complexity in relating to people. *See Haney v. Saul*, No. 5:18-CV-02280-SK, 2020 WL 10965122, at *1 (C.D. Cal. Feb. 18, 2020) (citing DOT, Parts of the Occupational Definition, 1991 WL 645965); *see also* DICOT 381.687-014 (Cleaner, Commercial or Institutional), 1991 WL 673257; DICOT 381.687-022 (Cleaner, Laboratory Equipment), 1991 WL 673259; DICOT 920.587-018 (Packager, Hand), 1991 WL 687916.  Level 8 occupations entail "[a]ttending to the work assignment instructions or orders of supervisor" and require "[n]o immediate response . . . unless clarification of instructions or orders is needed." *See* DOT, Appendix B, Explanation of Data, People, Things, 1991 WL 688701.[9]  Moreover, all three jobs are unskilled jobs which require only limited interaction with people. *See* Social Security Ruling 85-15, 1985 WL 56857, at *4 (stating that unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people"); *see also* AR 36.  Therefore, although the ALJ erred in rejecting Dr. Nicholson's opinion that Plaintiff is moderately limited in his ability to relate to and interact with coworkers and the public, that error was harmless because he incorporated such limitations into the RFC and the jobs identified by the VE reflect such limitations.

However, in the RFC, the ALJ did not incorporate Dr. Nicholson's opinion that Plaintiff's ability to perform work activities without special or additional supervision would be moderately limited.  As such, the Court finds that the ALJ's error with respect to this opinion is not harmless.  The requirement that an ALJ articulate his reasoning on both supportability and consistency is to allow a subsequent reviewer to trace the path of the adjudicator's reasoning, and the Court cannot do so here. *See Kimberli M. S.*, 2023 WL 2346330, at *8 (citing 82 Fed. Reg. at 5,858 (stating that the articulation requirements in

---

[9]  Dr. Nicholson also opined that Plaintiff's ability to accept instructions from supervisors is mildly limited. (AR 766.)  The ALJ found this opinion persuasive. (AR 33.)

the rules allow a subsequent reviewer or reviewing court to trace the path of the adjudicator's reasoning)).

Accordingly, the Court finds that the ALJ erred, in a way that is not harmless, in his analysis of Dr. Nicholson's opinion that Plaintiff's ability to perform work activities without special or additional supervision would be moderately limited.

### D.   Remand Is Appropriate

Plaintiff requests that this case be remanded to the Commissioner for further proceedings. (ECF No. 16 at 24.)  The Commissioner asks that the Court affirm the ALJ's decision. (ECF No. 18 at 9.)  The law is well established that the decision of whether to remand for further proceedings or simply to award benefits is within the discretion of the Court. *See, e.g.*, *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  Remand is warranted where additional administrative proceedings could remedy defects in the decision. *See, e.g.*, *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984); *Lewin*, 654 F.2d at 635.  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); where the record has been fully developed, *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986); or where remand would unnecessarily delay the receipt of benefits, *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985).  Here, the Court finds that this is not an instance where no useful purpose would be served by further administrative proceedings; rather, additional administrative proceedings still could remedy the defects in the ALJ's decision.

## VI.   CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court **RECOMMENDS** that Plaintiff's merits brief be **GRANTED**, and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

///

Any party having objections to the Court's proposed findings and recommendations shall file specific written objections within **14 days** after being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b)(2). The objections should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within **14 days** after being served with a copy of the objections. *See id.*

**IT IS SO ORDERED.**

Dated: December 15, 2023

Hon. Jill L. Burkhardt
United States Magistrate Judge